IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 2:07CR12-MEF |
| ) | |
| GREGORY LEWIS DAVIS ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On January 17, 2007, the Grand Jury for the Middle District of Alabama returned a one count indictment against defendant, Gregory Lewis Davis ("Davis"). The indictment alleges Davis is a felon who thereafter possessed a .40 caliber pistol and 10 live rounds of .40 caliber ammunition. Davis argues the discovery of the pistol and ammunition, and use of his incriminating statements thereafter to law enforcement, violate his rights under the Fourth and Fifth Amendments, respectively, and thus bars the admission of the evidence and statement. For the reasons below the Magistrate Judge recommends that the District Court DENY the motion to suppress.

### I. FACTUAL BACKGROUND

On November 22, 2006, at approximately 10:00 a.m., members of the Montgomery Narcotics Bureau received a tip that someone was selling narcotics in rooms 133 and 242 of the Motel 6 on the Eastern Boulevard, Montgomery, Alabama. A group of six officers arrived at Motel 6 around 10:50 a.m. and began to watch the rooms identified in the tip. Seeing no unusual activity around rooms 133 and 242, the officers decided to further the

investigation through a ruse. An officer called one room and told the person who answered the telephone to " lookout because the police were coming." Within one minute of the call, approximately five or six persons left the rooms and fled across the parking lot. As the rooms emptied, the Officers left their concealment and began asking the suspects who left the targeted rooms about the report they received earlier about drug trafficking in rooms 133 and 242.

While other colleagues were questioning the suspects who fled from the rooms, Sergeant Mike Drummond ("Drummond") drove around the motel parking lot along the route marked "X1" to ensure no suspects evaded police questioning. (*See* Motel Map, attached). Drummond could not see either target room, or the persons who fled from the rooms when the other officer made the ruse call. As Drummond drove along route X1 he saw defendant Davis in his periphery at the position labeled "D1." Drummond continued around the corner of the hotel to the position marked "X2." As Drummond got out of his unmarked car, he saw Davis at the position labeled "D2." Drummond saw Davis peep around the corner and jerk back out of view.[1]

Drummond lost sight of Davis but he called Lieutenant Caviness ("Caviness"), who

---

[1] Drummond knew defendant Davis from an encounter in April, 2006. In the earlier encounter, Drummond received a tip Davis had drugs stored in a commercial storage building on Vaughn Road in Montgomery. Drummond told Davis, who was previously convicted on felony drug charges, about the tip. Davis gave Drummond and other officers consent to search his 3 storage buildings on Vaughn Road. Drummond found no drugs but he did find and seize a large quantity of counterfeit merchandise.

was sitting in an unmarked pickup in the position labeled "Y1," and inquired whether Caviness saw Davis. Caviness said he had Davis in sight.[2] Caviness testified that approximately one minute after the ruse call he saw Davis near the position labeled D1. Caviness thought Davis was one of the persons who fled from the rooms because Davis's first appearance near D1 was consistent with the amount of time it would take one to flee from room 133 after the ruse call and appear at D1. According to Caviness, Davis ran after Drummond and took up the position labeled D2. While Davis was in the position labeled D2, Caviness saw Davis peek around the corner toward X2 and jerk back around the corner. Caviness also became concerned for his safety as well as the safety of Drummond, because Davis appeared unusually interested in the activities of the Drummond, yet remained concealed from the view of Drummond and the other officers. Caviness surmised Davis posed a threat to Drummond, because Davis clearly followed Drummond, but remained in a position where he could observe the scene undetected, and possibly ambush the officers. From his training and 19 years of experience as a police officer, Caviness knew drug traffickers often carry firearms which they are apt to use against any threat, including police.

Before Caviness could react, Davis began to retrace his route toward D1. Caviness did not know whether Davis's intent was to position himself where he could continue observing the officers unseen and possibly pose a safety threat. Caviness got out of his

---

[2] Like Drummond, Caviness also knew Davis from the storage building search in April, 2006.

unmarked truck near Y1 and showed his badge to Davis. Caviness told Davis to show his hands. In response, Davis began moving his hands repeatedly about his waist and torso. Davis wore a coat which prevented Caviness from clearly observing what Davis was trying to find on his person. Davis refused to show his hands to Caviness and continued making furtive gestures about his waist and torso after multiple commands from Caviness to show his hands. Simply put, Davis's actions frightened Caviness enough to prompt Caviness to draw his pistol for safety. Caviness had to aim his pistol at Davis to make Davis show his hands. In the meantime, Drummond left his position near X2 and traveled to Davis and Caviness near X3. When Drummond came to X3 Caviness had his pistol pointed at Davis, who had finally raised his hands. Drummond and Caviness saw Davis was nervous - sweating even though it was November - and appeared to be scouting a place to run. Drummond asked Davis if he had any weapons, and Davis told Drummond he would find a .40 caliber pistol in his left jacket pocket and a full clip of .40 caliber ammunition in his right jacket pocket. Drummond frisked Davis and found a .40 caliber pistol and a clip of ammunition where Davis said they were. Davis attempted to make statements to Drummond about cooperation. After oral Miranda warnings from the officers, Davis agreed to cooperate with police. Davis said he would cooperate with the police by purchasing cocaine from his associates and that he knowingly possessed the pistol and ammunition.

Davis described the same events from his own perspective. Davis's testimony is largely irrelevant inasmuch as the admissibility of the firearm and pistol hinges upon the

clearly articulable and reasonable suspicions of the officers. Davis's narrative is useful insofar as the testimony corroborates key points of testimony by Drummond and Caviness. Davis admitted he did pursue Drummond along route D1, and he did peer around the corner toward Drummond. Further, Davis corroborated Drummond and Caviness' account about the storage building search several months earlier. Davis acknowledged he followed Drummond's vehicle, and from his vantage point near D2, saw Drummond talking with other officers. Davis said he began to retrace route D1 when he encountered Caviness. Davis agreed that he did not immediately comply with Caviness's order to show his hands. Shortly thereafter, Drummond arrived, frisked Davis, and discovered the firearm and ammunition in his possession.

## II. DISCUSSION

The admissibility of the pistol, ammunition and the statements against Davis hinges upon the answers to two questions: (1) Did the discovery of the pistol and ammunition violate the Fourth-Amendment? (2) Do the statements made by Davis after Drummond found the pistol and ammunition contravene the Fifth Amendment? The facts and law clearly demonstrates the answer to each question is, no.

### A. Fourth Amendment Violation

Davis argues officers had no reasonable suspicion to search him and thus find the firearm or ammunition. Evidence found during an officer's warrantless investigatory stop of a citizen may be admissible. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968).

To evaluate the reasonableness of an investigative stop, the court is required under *Terry* to make a "dual inquiry," examining first "whether the officer's action was justified at its inception," which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime. *United States v. Powell*, 222 F.3d 913, 917 (11th Cir.2000) (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879). The second *Terry* inquiry is whether the investigative stop was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, id.* at 20, 88 S.Ct. 1879.

With regard to the initial inquiry – indisputably the dispositive focus on this record – the officer's "reasonable suspicion" cannot be based on merely an "inchoate and unparticularized suspicion or hunch." *Id.* at 27; *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585 (1985). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 675-76 (2000). "A search or seizure is ordinarily unreasonable in the absence of [at least some] individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 451 (2000).

In assessing the requisite "reasonable suspicion," the court "must look at the 'totality of the circumstances' surrounding each case to see whether the detaining officer has a

'particularized and objective basis' for suspected legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750 (2002) (citation omitted). As explained in *Arvizu*, "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273, 122 S.Ct. at 750-51 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). The totality of the circumstances must support a finding of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop and frisk. *United States v. Hunter*, 291 F.3d 1302, 1306 (2002) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1868). A fair consideration of the "totality of the circumstances" means that the court should not rest its analysis on a consideration of each fact in isolation. *Hunter, id.* at 1306, citing *Arvizu*, 534 U.S. at 275, 122 S.Ct. at 751.

In this case, Officers Caviness and Drummond went to the Motel 6 to investigate a tip regarding drug trafficking from two specific motel rooms. After flushing the occupants from those rooms with a phone call, several men who were persons of interest to the officers appeared in the motel parking lot. Although Davis was not identified as one of the men leaving the rooms, his appearance in the parking lot was consistent with the "flushing" of the drug suspects. Davis admittedly sought out Drummond when Drummond came to assist in closing the net around potential drug suspects. Davis's apparent interest in, and observation of, Drummond, created concern on the part of Caviness. The concern was based on what

appeared to be odd behavior - a man who monitors the movements of his fellow officer, yet appears to remain hidden, at the very moment when that officer is working to ensure no drug suspect eludes questioning. Caviness became concerned enough for the safety of his fellow officer to identify himself as a policeman and approach Davis with instructions to show his hands. Davis's failure to comply, coupled with his furtive hand movements, led Caviness to believe Davis had a weapon, thus Caviness drew his own firearm.

Caviness's observation of Davis, and his thoughts at the time, support a finding of reasonable suspicion. Drug suspects were present in the motel parking lot; Davis's appearance coincided with the presence of the other suspects in the parking lot and was consistent with the ruse; and seven months earlier, Davis was a suspect in a drug investigation by Drummond and Caviness. When Davis followed and spied upon the officers, Caviness reasonably believed Davis intended to harm Drummond or other officers, and was part of the drug activity under investigation. The Eleventh Circuit has long acknowledged "drug dealing is known to be extremely violent." *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993). "'A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' even if such activity is 'seemingly innocuous to the ordinary citizen.'" *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (internal citations omitted). Caviness simply applied his police training and 19 years of law enforcement experience when he stopped Davis. Davis's refusal to comply, combined with patting his jacket, raised Caviness's initial suspicions about Davis, and led him to draw

his weapon for his own safety.

Davis's Fourth Amendment challenge to the stop in this case does not overcome the officers' actions in this case. It is true that Davis's testimony concerning his past encounter with Drummond, and his movements and behavior in the motel parking lot on November 22, 2006, provide a fuller picture of his intentions. Regardless, the actions of police officers must be measured from the observation and reasonable inferences the officers drew from their observations. Caviness's observation of Davis, his reluctance to comply with the order to show his hands, and his hand movements which suggested a search for a weapon, combined to prompt a search of his person.

The court finds the stop and search of Davis did not violate the Fourth Amendment, and recommends the District Court deny the motion to suppress evidence on those grounds.

### B. Fifth Amendment Violation

Davis agrees his statements to law enforcement are admissible if the underlying discovery of the firearms passes muster. Davis alleges various incriminating statements he made after the officers found the pistol and ammunition were taken in contravention of the Fifth Amendment. The Fifth Amendment provides that "[n]o person... shall be compelled in any criminal case to be a witness against himself." Custodial police interrogations trigger Fifth Amendment concerns. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). "The Fifth Amendment itself does not prohibit all incriminating admissions; '[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the

most damning admissions.'" *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984).

Drummond arrested Davis after finding the pistol and ammunition in his jacket. Drummond informed Davis of his rights against self incrimination and to the assistance of counsel. Davis gave an oral waiver of his Fifth Amendment rights. Fifth Amendment rights are personal rights which may be set aside if a person waives their rights. No threats, force, inducements or any other impermissible acts made Davis waive his Fifth Amendment rights. All statements by Davis should therefore be fully admissible at trial.

### III. CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that the motion to suppress filed by the defendant be DENIED.

***It is further ORDERED that the parties shall file any objections to the said Recommendation by June 26, 2007.*** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from

attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 18th day of June, 2007.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE