## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:07cr12-MEF |
| | ) | |
| GREGORY LEWIS DAVIS | ) | |

### DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE REGARDING MOTION TO SUPPRESS

**COMES NOW** the Defendant, **GREGORY LEWIS DAVIS,** by undersigned counsel, Donnie W. Bethel, and makes the following objections to the Report and Recommendation (R&R) of the Magistrate Judge filed in this matter on June 18, 2007.

1.      Mr. Davis objects to the Magistrate Judge's factual findings, because his R&R merely adopts as fact the portions of Lt. Caviness's testimony that support the Magistrate Judge's recommendation that Mr. Davis's Motion to Suppress should be denied.

2.      Mr. Davis agrees with the following facts contained in the R&R. On November 22, 2006, members of the MPD received a tip that unidentified subjects were selling drugs from rooms 133 and 242 of the Motel 6.  At approximately 10:55 a.m. MPD officers set up surveillance of the rooms.  After they observed no suspicious activity, Detective Hamil placed calls to the rooms.  When subjects exited the rooms, officers approached them.

3.      Mr. Davis disagrees with the Magistrate Judge's characterization of the facts beginning with the fourth line of page 3 of his R&R, where he asserts that, "Caviness thought

Davis was one of the persons who fled from the rooms because Davis's first appearance near

D1 was consistent with the amount of time it would take one to flee from room 133 after the

ruse call and appear at D1." In fact, the following colloquy occurred between the prosecutor

and Caviness: "Q: So the ultimate question is, you don't know whether in fact he came out

of one of those rooms. Correct? A: I–he come from the area of the building. There is a

passageway here that you can get to that side, but I never saw him at this room or– Q: Okay.

A: –at one of the suspect rooms. I never saw him there." Doc. 37, p. 62. That is hardly an

affirmative statement from Caviness that he thought Mr. Davis came from one of the suspect

rooms, as the Magistrate Judge categorically stated. For another example of the rather

skewed view of the facts that the Magistrate Judge gives, he goes on to state on page 3,

"According to Caviness, Davis ran after Drummond and took up the position labeled D2."

The Magistrate Judge, however, fails to mention that Sgt. Drummond testified that Mr. Davis

did ***not*** run around the building, but moved at a fast walk (Doc. 37, pp. 38-39)–which

testimony was consistent with the testimony of Mr. Davis and Mr. Rander Chapman.

    4.    Neither Sgt. Drummond nor Lt. Caviness testified that they observed Mr. Davis

anywhere near either of the rooms that were under surveillance, and they both admitted that

they had no evidence to suggest that Mr. Davis was present in either of those rooms. In fact,

Mr. Davis was not one of the subjects that emerged from the rooms under surveillance when

Det. Hamil placed calls to the rooms. Both Mr. Davis and Rander Chapman testified that

about the same time that Det. Hamil placed the ruse phone calls to the rooms, Mr. Davis had

just returned to the hotel grounds; he had been riding as a passenger in a van driven by Mr.

Chapman, the Motel 6 maintenance man. Doc. 37, pp. 93 and 110. Mr. Davis further testified that: as he exited the van he saw a car drive through the Motel 6 parking lot and around the building at a high rate of speed, and he recognized Sgt. Drummond, whom he knew, as the driver; he walked around the building to see what was going on; after walking around the building he observed two police cars on the other side of the building outside room 133; he decided to mind his own business, returned to the side of the building from where he had come, and walked toward the room where he lived at the time, room 103. It was at this time that Lt Caviness initiated contact with Mr. Davis based on Caviness's claim that Mr. Davis was acting suspiciously. When one considers all the testimony adduced at the hearing, it becomes quite clear that Caviness's claim that Mr. Davis was acting suspiciously is greatly suspect.

5.     There is no dispute that Caviness was parked at the location marked Y1on Attachment 1 to the R&R. Mr. Davis and Mr. Chapman both testified that Mr. Chapman drove around the end of the building closest to Y1 and parked in front of room 118, which is the last room at the end of the building. That means that Mr. Chapman drove his van *directly toward the spot where Caviness was parked and then circled around and parked right in front of him*. Yet Caviness and the Magistrate Judge would have one believe that this highly-trained police officer with 19 years experience–who was parked at that location for the express purpose of providing surveillance–didn't see the van pull into the parking lot, and didn't see Mr. Chapman and Mr. Davis get out of the van. That is simply not believable. Further, Caviness's claim that he initially saw Mr. Davis at the location marked D1 also

cannot be true. Both Mr. Chapman and Mr. Davis also testified that when they exited the van that Mr. Chapman headed toward the Motel 6 office and that Mr. Davis headed toward the end of the building, where he had just seen Sgt. Drummond drive past, because Mr. Davis wanted to talk to Sgt. Drummond. Doc. 37, pp. 94 and 114. In other words, from where Mr. Chapman parked the van, Mr. Chapman walked in the direction of D1, while Mr. Davis walked in the *opposite* direction–Caviness simply couldn't have first seen Mr. Davis near the area marked D1.

6.    As for other evidence bearing on Lt Caviness's credibility, consider his ability–or lack thereof–to recall details of what happened that day. At the hearing he remembered every detail of Mr. Davis's demeanor when he approached Mr. Davis to question him–his hand movements, how he sweat, how he spoke, etc., but to many cross-examination questions about what he observed that day, his favorite response was, "I can't recall." "Q: So far as you can recall, you don't remember seeing Mr. Davis make a cell phone call before those suspects were flushed out fo the room? A: I don't recall. Q: You didn't take a cell phone off Mr. Davis, as far as you recall, correct? A: I don't recall. Q: When you searched his car did you find a cell phone? A: I don't recall. Q: When you saw Mr. Davis over here on this side of the building . . . you stuck your arm out the driver's side window , showed him the badge–showed him your badge, right? A: I could have. I don't recall." Doc. 37, pp. 70- 72.

7.    During the second half of the Prosecutor's redirect examination of Sgt. Drummond and his direct examination of Caviness, he asked questions at length about

countersurveillance, giving Caviness, especially, the opportunity to discuss the topic. Curiously, the Prosecutor never mentioned the word "countersurveillance" during his direct examination nor during the first half of his redirect examination of Sgt. Drummond, who was his first witness. There is a simple explanation for this: the first person in the courtroom to broach the subject was the Magistrate Judge–he asked Sgt Drummond to tell him about "lookouts" after the Prosecutor had conducted both his direct and redirect examination of Sgt. Drummond. Doc. 37, p. 40. After the Magistrate Judge hung that piñata up for the Prosecutor to take a whack at, he beat it thoroughly to death. This discussion during the hearing was a nothing more than a red herring. Absolutely no evidence was adduced that tied Mr. Davis in any way to the alleged drug activity that occurred in rooms 133 and 242. The officers found no cell phone on Mr. Davis, and they did not observe him make any cell phone calls, and they said nothing in the written report of the arrest about any suspicions that Mr. Davis may have been acting as some sort of lookout. Further, any imaginary concerns that the officers might have conjured up during the hearing that Mr. Davis might have been operating as some sort of lookout evaporate into thin air when one considers the timing of events: the officers didn't see Mr. Davis until *after* Det. Hamil placed the ruse phone calls to rooms 133 and 242, and the occupants of those rooms had been flushed outside. Anyone playing the role of a lookout who would have called the occupants of those rooms at that point would have been closing the barn door after the horse got out. No, what happened at the hearing was that the Magistrate Judge tossed the Prosecutor and his witnesses a softball and invited them to hit it out of the park, after which they swung with all their might.

8.      So, what did Caviness see?  He didn't observe someone who fled from one of the rooms under surveillance, he didn't observe someone conducting countersurveillance, he didn't observe someone with a bag of dope or a weapon in his hands.  He saw a black man, during the middle of the day, in the general location where officers suspected illegal drug activity was occurring (even though no evidence of such illegal activity was found), who took an interest in what was going on.  That's it.

9.      These experienced officers, however, have been around more than long enough to know the magic words they must utter to validate their intrusion into the life of Mr. Davis–reasonable suspicion.  Mr. Davis attributes no nefarious motive to Lt. Caviness in his false declaration that Mr. Davis acted sufficiently "suspicious" to justify stopping and scrutinizing Mr. Davis.  From a pragmatic, law-enforcement approach, the ends justify the means: a convicted felon was in possession of gun; guilty people should be prosecuted, convicted and sent to prison; so, there is no real harm in saying that Mr. Davis acted suspiciously and posed a potential threat to other officers, because in the end, a guilty person will be punished, rather than go free.  However, the law demands that even the rights of convicted felons to be free from unreasonable searches must be protected.  When the Court considers the testimony in detail and in its entirety in order to assesses the credibility of the various witnesses, Mr. Davis vehemently asserts that common sense is on his side.

10.     On page 8 of his R&R, the Magistrate Judge sums up his view thusly: "Caviness's observation of Davis, and his thoughts at the time, support a finding of reasonable suspicion.  Drug suspects were present in the motel parking lot, Davis's

appearance coincided with the presence of the other suspects in the parking lot and was consistent with the ruse; and seven months earlier, Davis was a suspect in a drug investigation by Drummond and Caviness.  When Davis followed and spied upon the officers upon the officers, Caviness reasonably believed Davis intended to harm Drummond or the other officers, and was part of the drug activity under investigation."  The Magistrate Judge is far too generous in the deference he affords to Lt. Caviness in suggesting that Caviness was justified in stopping Mr. Davis.  If one carefully analyzes the pillars of support that the Magistrate Judge uses to justify Caviness's decision to stop and detain Mr. Davis, this becomes apparent.  First, consider the fact that drug suspects were in the parking lot and Mr. Davis appeared at the same time–albeit on the other side of the building, well away from where the suspects were being questioned, and well away from the rooms they had occupied. According to this rationale,  when a police officer questions a suspect, any unfortunate citizen who happens to be in the neighborhood can be stopped and questioned, too.  Next, consider the fact that seven months earlier Davis was a suspect in another drug investigation. The Magistrate Judge's use of this fact to affirm the reasonableness of Caviness stopping Mr. Davis is troubling because, as the Magistrate Judge acknowledges, even though Mr. Davis may have been a suspect, he gave Drummond and Caviness permission to search three storage buildings, in which the officers ***found no drugs***.  If one accepts the Magistrate Judge's position, once a citizen–rightly or wrongly–is suspected of a committing some offense, that citizen forever becomes subject to  being stopped and questioned by a police officer, merely because he was once a suspect in another offense at another place and time.

Next, consider that the Magistrate concludes that Caviness was reasonably concerned about the safety of Sgt. Drummond and the other officers. Caviness based this nebulous concern on nothing more than the fact that Mr. Davis walked around the building to see what was going on. Caviness didn't see Mr. Davis in possession of any kind of weapon. It's conceivable that anyone in proximity to a police officer could be a potential threat, but the only basis upon which Caviness could say that he considered Mr. Davis to be a threat was that he was "peeking" around the building at the other officers. That alone is a rather giant leap in logic, but when Mr. Davis returned to the side of the building that was *away* from where Drummond and the other officers were questioning suspects, he was no longer a threat to them.

11.    In the final analysis, the only evidence that the police can offer in this case that Mr. Davis was engaged in some kind of criminal activity is their that Mr. Davis was hiding around the corner of the building watching what the police were doing–and Mr. Davis disputes the characterization of his actions as "hiding." In other words, Lt Caviness initially made contact with Mr. Davis merely because he was discreetly rubbernecking. That's it. That is hardly enough for an officer to claim that he had a reasonable suspicion that Mr. Davis was engaged in or about to engage in criminal activity, nor does it provide a particularized and objective basis for suspected legal wrongdoing. Lt Caviness detained Mr. Davis simply based on an unparticularized or unsupported hunch, which violates the Fourth Amendment. The seizure of Mr. Davis and the subsequent search were unlawful, and the evidence recovered from Mr. Davis's person, the gun, should be suppressed.

12.    Further, because the initial seizure and search were unlawful, any statements that Mr. Davis about the gun should also be suppressed as fruits of the illegally seized evidence.

13.    Contrary to the Recommendation of the Magistrate Judge, the gun seized from Mr. Davis and all the statements that Mr. Davis made, as well any other evidence obtained from or that was the fruit of such seizures, should be suppressed.

Dated this 13th day of July, 2007.

Respectfully submitted,

s/ Donnie W. Bethel
DONNIE W. BETHEL
Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail:don_bethel@fd.org
IN Bar Code: 14773-49

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:07cr12-MEF |
| | ) | |
| GREGORY LEWIS DAVIS | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2007,  I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Verne H. Speirs, Esq., Assistant U. S. Attorney, One Court Square, Suite 201, Montgomery, Alabama  36104.

Respectfully submitted,

s/ Donnie W. Bethel
DONNIE W. BETHEL
Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail:don_bethel@fd.org
IN Bar Code: 14773-49